UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, a nonprofit corporation,<br>   1333 N. Oracle Rd.<br>   Tucson, AZ 85705<br><br>   **Plaintiff,**<br><br>         v.<br><br>**KEN SALAZAR**, United States Secretary of the Interior<br>   1849 C Street, N.W.<br>   Washington, D.C. 20240<br><br>**MINERALS MANAGEMENT SERVICE**<br>   1849 C Street, N.W.<br>   Washington, D.C. 20240<br><br>   **Defendants.** | **Case No:** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# I. INTRODUCTION

1. In this civil action for declaratory and injunctive relief, Plaintiff CENTER FOR BIOLOGICAL DIVERSITY challenges the failure of Defendants KEN SALAZAR, United States Secretary of the Interior and the MINERALS MANAGEMENT SERVICE (collectively "the Secretary") to comply with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") when approving offshore oil drilling plans in the Gulf of Mexico. Notwithstanding the significant adverse effects that offshore drilling can and does have on marine and coastal resources of the Gulf, including impacts from oil spills, the Secretary has approved, and continues to approve, oil drilling plans in the Gulf without the environmental reviews mandated by NEPA. The Secretary has instead approved each such drilling plan through the use of a "categorical exclusion," an exemption to NEPA's requirements that is only applicable when there is no possibility of significant environmental effects.

2. The April 20, 2010 blowout of the *Deepwater Horizon* drill rig, and subsequent and ongoing oil spill from that blowout, demonstrates that large-magnitude oil spills can and do result from offshore oil drilling in the Gulf of Mexico. Since the *Deepwater Horizon* oil spill, the Secretary has continued to approve similar exploration plans with categorical exclusions, each time concluding that there is no possibility of significant environmental impacts from the proposed drilling. While the Secretary's conclusion that no significant effects could occur from exploration drilling was dubious before the *Deepwater Horizon* spill, such a position is now clearly untenable.

3. The Center for Biological Diversity challenges as unlawful the Secretary's decision to categorically exclude from NEPA review multiple drilling plans approved since the *Deepwater Horizon* spill, as well as the Secretary's underlying policy that purports to justify such a decision. The Center seeks an order setting aside the Secretary's unlawful decisions and policies and enjoining the Secretary from further utilizing such exclusions when approving drilling operations in the Gulf. Such an order is necessary to afford the sensitive species and ecosystems of the Gulf, as well as the individuals and communities dependant on those

resources, of the procedural and substantive protections to which they are lawfully entitled and, in light of the *Deepwater Horizon* spill, so desperately need.

## II. JURISDICTION AND VENUE

4. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy); and 5 U.S.C. §§ 702-706 (Administrative Procedure Act).

5. Venue is proper in this court because Defendants reside in this district. 28 U.S.C. § 1391(e).

## III. PARTIES

6. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a nonprofit corporation that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the world. Center members, staff, and board members include people with aesthetic, professional, recreational, spiritual, educational, scientific, moral, and conservation interests in the species and habitats of the Gulf of Mexico that have been, and unless the relief sought in this Complaint is granted, will continue to be harmed by Defendants' actions and inactions.

7. The Center has over 40,000 members, including those who have viewed, photographed, and otherwise appreciated the species, habitats and ecosystems of the Gulf of Mexico, and who intend to visit and enjoy these species, habitats and ecosystems in the future. The Center's members use the Gulf of Mexico for wildlife observation, research, nature photography, aesthetic enjoyment, recreational, educational, and other activities.

8. Center members travel to and recreate in the marine and coastal waters, marshes and beaches of the Gulf of Mexico. Center members observe or attempt to observe the fish and wildlife of the Gulf region. The Center's members have concrete plans to continue to travel to

the Gulf, to work and recreate in the region, and to visit the habitats of, and observe or attempt to observe, the fish and wildlife species of the region. Moreover, to ensure that these species and ecosystems continue to exist, the Center, its members, staff, and board have worked and plan to continue to work to protect and preserve the habitats necessary for survival and recovery of these species and ecosystems. Therefore, not only do the Center's members, staff, and/or board have strong aesthetic, recreational, moral and spiritual interests in the species and ecosystems of the Gulf, they also have strong professional, conservation, education, and scientific interests in them as well.

9. The Center, its members, staff, and board suffer procedural and informational injuries flowing from the Secretary's failure to comply with NEPA. The Secretary's decisions to exclude from NEPA review the drilling plans that are the subject of this Complaint deprive the Center, its members, staff, and board of information to which they are statutorily entitled. Because NEPA provides for public participation, including a public comment period and public hearings, the failure of the Secretary to carry out a NEPA process for the drilling plans that are the subject of this Complaint, prevents the Center, its members, staff, and board from participating in the environmental review process for those plans in the manner Congress intended. The Secretary's failure to comply with NEPA therefore also frustrates and harms procedural interests of the Center, its members, staff, and board.

10. The Secretary's failure to comply with the procedural mandates of NEPA when approving drilling plans in the Gulf of Mexico, not only harms the procedural interest of the Center, its members, staff, and board, but also has harmed and threatens future harm to the concrete interests the Center, its members, staff, and board have in the fish, wildlife and ecosystems of the Gulf of Mexico. The Secretary's failure to subject the approval of drilling plans to the environmental review process of NEPA has meant that the potential harmful effects of those plans has not been properly disclosed, analyzed or mitigated. This has resulted in uninformed and unwise decision-making. Such poor decision-making can and does have severe impacts on the fish, wildlife and ecosystems of the Gulf, with accidents such as the *Deepwater*

*Horizon* oil spill more likely to occur as a result. The recreational, aesthetic, conservation, educational, and scientific interests of the Center, its members, and staff in the fish, wildlife and ecosystems of the Gulf, have been, are being, and unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by the Secretary's actions and inactions related to the approval of drilling plans without full and proper environmental review. The interests of the Center's members and the organization are thus directly and adversely affected by the Secretary's unlawful actions. However, if the Secretary had carried out a full environmental review before approving the drilling plans, he would likely have either denied the plans, or required measures that better protect the species and ecosystems of the Gulf, and the Center and its members' interests in those species and ecosystems, from the adverse impacts of oil drilling.

11. In sum, unless this Court grants the requested relief and orders the Secretary to comply with the environmental review provisions of NEPA when approving drilling plans in the Gulf of Mexico, statutorily required information will not be made available, required public participation procedures will not be initiated, and the aesthetic, recreational, educational, professional, scientific, spiritual, moral, and conservation interests of the Center, its members, its staff, and its board will continue to be adversely affected. The injuries to the Center, its members, and staff would be redressed by declaratory and injunctive relief compelling the Secretary to comply with NEPA procedures before approving drilling plans. The Center brings this suit on its own behalf and on behalf of its adversely affected members, staff, and board. The Center has no adequate remedy at law.

12. Defendant KEN SALAZAR, United States Secretary of the Interior, is the highest ranking official within the Department of Interior and, in that capacity, has ultimate responsibility for the administration and implementation of offshore oil drilling activities that are the subject of this Complaint, and for compliance with all other federal laws applicable to the Department of the Interior, including NEPA. He is sued in his official capacity.

13. Defendant MINERALS MANAGEMENT SERVICE is an agency within the Department of Interior authorized and required by law to manage and oversee the leasing and development of oil and gas resources in the outer continental shelf, to protect the fish, wildlife and other resources of the outer continental shelf when carrying such activities, and to comply with other applicable laws, such as NEPA. The Minerals Management Service issued the policies, approvals and authorizations at issue in this Complaint.

## IV. STATUTORY BACKGROUND

### A. The National Environmental Policy Act

14. The goal of the National Environmental Project Act ("NEPA") is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4331. NEPA's fundamental purposes are to guarantee that: (1) agencies take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency has, and carefully considers, detailed information concerning significant environmental impacts; and (2) agencies make the relevant information available to the public so that it may also play a role in both the decision-making process and the implementation of that decision. *See, e.g.,* 40 C.F.R. § 1500.1.

15. NEPA and the regulations promulgated there under by the Council on Environmental Quality ("CEQ") require that federal agencies, including the Minerals Management Service, must prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

16. An EIS must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(C).

17. An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA also requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7, 1508.8. Cumulative impacts include the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future significant actions." 40 C.F.R. § 1508.7. Direct effects are caused by the action and occur at the same time and place. *See id.* § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. *See id.* § 1508.8(b). Both include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social, or health [effects]." *Id.*

18. In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action. 40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

19. Throughout the NEPA process, the agency is required to "insure the professional integrity, including scientific integrity," of its discussions and analyses. *Id.* § 1502.24.

20. An agency may first prepare a detailed Environmental Assessment ("EA") to determine whether the project may significantly affect the environment and thus requires a full EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.

21. If an EIS is not required, the federal agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9, 1508.13.

22. In very limited circumstance an agency may determine that an action it takes falls within a "categorical exclusion" to doing an EIS. A "categorical exclusion" is defined as a

category of actions which "do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4.

23. Any categorical exclusion must make allowances for "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.*

24. The Secretary has promulgated regulations dealing with compliance with NEPA, including regulations that describe when a categorical exemption is or is not available. *See* 43 C.F.R. § 46.

### B. The Outer Continental Shelf Lands Act

25. In 1953, Congress enacted the Outer Continental Shelf Lands Act (OCSLA) to authorize federal leasing of the outer continental shelf (OCS) for oil and gas development in federal waters. In 1978, Congress amended OCSLA (Pub. L. No. 95-372, 92 Stat. 632 *et seq.*) to provide, in part, for the development of resources on the OCS "subject to environmental safeguards." 43 U.S.C. § 1332(3)

26. OCSLA, as amended, establishes four distinct stages for oil and gas development activities on the OCS: (1) the development of a five-year leasing plan; (2) issuance of oil and gas leases; (3) approval of lessee's exploration plans; and (4) approval of lessee's development and production plans. 43 U.S.C. § 1331 *et seq.*

### V. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Secretary's NEPA Process in the Gulf

27. Offshore oil and gas exploration and development plans in the Gulf of Mexico largely escape any sort of meaningful environmental review under NEPA.

28. In the Gulf of Mexico the NEPA review only occurs at the lease sale stage. In 2007, the Secretary prepared a programmatic EIS for the Gulf of Mexico outer continental shelf oil and gas leasing activities for 2007-2012, and supplemented that EIS in 2009. The Secretary also prepared an EA in 2007 for Lease Sale 206 in the Gulf, the lease sale that led to the *Deepwater Horizon* spill.

29. Each of these NEPA documents for lease sales discussed the possibility of oil spills in only the most general terms. In each case the Secretary concluded that spill risks were low, and if a spill were to happen the environmental consequences would be minimal. No spill of the magnitude of the Deepwater Horizon spill was contemplated or analyzed.

30. While lease sale decisions usually get an EIS or EA, the Secretary routinely approves exploration plans and development plans, also known as Development Operation Coordination Documents, in the Gulf without preparing an EIS or an EA.

31. In choosing to forgo an EIS or EA for drilling plans, the Secretary relies upon a manual adopted on May 27, 2004.

32. According to the manual governing the Secretary's NEPA review and categorical exclusions, the approvals of (1) offshore lease exploration, development/production plans and (2) Development Operation Coordination Documents in the central or western Gulf of Mexico are categorically excluded from the need to prepare an EIS or an EA. 516 DM 15.4 (C)(10).

33. The manual does however provide for exceptions to the use of a categorical exclusion for drilling plans. A categorical exclusion cannot be used if a facility is proposed:

> (1) In areas of high seismic risk or seismicity, relatively untested deep water, or remote areas, or (2) within the boundary of a proposed or established marine sanctuary, and/or within or near the boundary of a proposed or established wildlife refuge or areas of high biological sensitivity; or (3) in areas of hazardous natural bottom conditions; or (4) utilizing new or unusual technology.

516 DM 15.4 (C)(10). In such cases, the Secretary is required to forgo using a categorical exclusion and instead prepare an EA or an EIS.

34. Hundreds of exploration plans and Development Operation Coordination Document are approved each year under the categorical exclusion policy. Accordingly, most of the drilling conducted in the Gulf of Mexico goes forward without a thorough analysis of the project specific and site-specific environmental impacts of the drilling.

35. Importantly, drilling plans that are categorically excluded from NEPA review do not undergo any analysis regarding the likelihood and consequences of a large oil spill.

## B. The Deepwater Horizon Oil Spill

36. On April 20, 2010, the *Deepwater Horizon*, an offshore oil rig exploded and caught fire in the Gulf of Mexico leaving 11 workers dead and spilling millions of gallons of oil into the water. The oil rig operated by BP sank two days later about 50 miles off the Louisiana coast. Five thousand feet below the surface, the ruptured deepwater well continues to gush oil.

37. Experts now estimate that nearly 30 million gallons of oil have spilled into the ocean – almost 3 times as much oil as was released by the Exxon Valdez.

38. At the time of this Complaint, satellite images show that the oil slick is spanning more than 4,922 square miles and has reached the shores of the Gulf Coast. Meanwhile, researchers have discovered massive plumes of oil in the deep waters beneath the sea surface. There is mounting concern that sea currents will carry the spill south past the Florida Keys and up the Atlantic Coast.

39. Hundreds of species in the Gulf of Mexico will be harmed by the toxic oil, including several threatened and endangered species of sea turtles, whales, and seabirds. Oiled seabirds have been among the first victims of the oil spill, and oil is beginning to wash up into wetlands where thousands of seabirds nest and rest from their migrations.

40. Marine animals such as sperm whales in the massive spill area have been exposed to the oil, which can impair behavior, respiratory functions, reproduction, food availability, and poison prey. Moreover, toxic persistent compounds in the oil remain in the environment and accumulate in the food chain. Significant impacts on the environment will continue for years to come.

41. Despite extensive efforts to respond to the oil spill, the prospects of stopping the leak are still distant. Meanwhile, cleanup and containment efforts have proven inadequate to prevent disastrous impacts on ocean ecosystems and wildlife. More than 560,000 gallons of dispersant have been deployed to break up the oil spill, which comes with its own set of environmental effects. Additionally, oil fumes and controlled burns pollute the air.

42. The *Deepwater Horizon* oil spill is poised to become one of the worst environmental disasters in U.S. history, thus demonstrating the significant environmental impacts that can and do result from exploration drilling.

### C. The Secretary's Drilling Plan Approvals Since the Spill

43. On April 6, 2009, the Secretary approved BP's exploration plan allowing the drilling that resulted in the catastrophic *Deepwater Horizon* oil spill. The approval was under a categorical exclusion pursuant to the policy set forth in the Minerals Management Service's department manual for NEPA. 516 DM 15.4 (C)(10).

44. Since the explosion and oil spill resulting from BP's exploratory drilling on April 20, 2010, the Secretary has approved at least two dozen additional exploration plans and Development Operation Coordination Documents under the categorical exclusion policy. In each case the Secretary had to make a finding that no significant environmental impacts could occur.

45. In light of the *Deepwater Horizon* oil spill, it is clear that exploratory and development drilling can and does result in significant environmental impacts. The Secretary's policy, as articulated in the department manual, that drilling should be categorically excluded from further NEPA review was arbitrary when it was adopted. Moreover, even if the categorical exclusion policy could somehow be deemed to have been rational and lawful at the time it was promulgated, the *Deepwater Horizon* spill completely undermines the foundation of the policy—namely that the risk of a large oil spill from drilling is so low that it can be completely discounted. Consequently, the Secretary's post-spill approval of additional drilling plans with categorical exclusions from NEPA review is wholly irrational. Such approvals and actions were arbitrary and capricious, and must now be set aside by this Court.

\ \ \

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of National Environmental Policy Act, 42 U.S.C. § 4321 et seq. for Adopting Unlawful Categorical Exclusions)**

46. The Center realleges and incorporates by reference all the allegations set forth in this Complaint, as though fully set forth below.

47. The Secretary's May 27, 2004 adoption in the Minerals Management Service Departmental Manual 516 DM 5.14 of a categorical exclusion for the approval of exploration plans and development and production plans violates NEPA, 42 U.S.C. §§ 4321 *et seq.*, the regulations promulgated by CEQ, 40 C.F.R. §§ 1500.1 *et seq.*, and the Secretary's own NEPA regulations, 43 C.F.R. §§ 46.10 *et seq.* Such action is arbitrary and capricious, an abuse of discretion, not in accordance with law, and a fails to observe proper procedure under the Administrative Procedures Act, 5 U.S.C. §§ 701-706, and is subject to judicial review there under.

## SECOND CLAIM FOR RELIEF

**(Violation of National Environmental Policy Act, 42 U.S.C. § 4321 et seq. for Categorically Excluding Drilling Plans from Environmental Review)**

48. The Center realleges and incorporates by reference all the allegations set forth in this Complaint, as though fully set forth below.

49. The Secretary's issuance of categorical exclusions for the approval of drilling plans in the Gulf of Mexico subsequent to the *Deepwater Horizon* oil spill on April 20, 2010 violates NEPA, 42 U.S.C. §§ 4321 *et seq.*, the regulations promulgated by CEQ, 40 C.F.R. §§ 1500.1 *et seq.*, and the Secretary's own NEPA regulations, 43 C.F.R. §§ 46.10 *et seq.* Such action is arbitrary and capricious, an abuse of discretion, not in accordance with law, and fails to observe proper procedure under the Administrative Procedures Act, 5 U.S.C. §§ 701-706, and is subject to judicial review there under.

## VII. PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests that the Court grant the following relief.

1. Declare that the Secretary is in violation of NEPA and the APA for promulgating and carrying out a policy of categorically excluding outer continental shelf drilling operations from environmental review;

2. Declare that the Secretary is in violation of NEPA and the APA for categorically excluding outer continental shelf drilling operations from environmental review subsequent to the *Deepwater Horizon* oil spill;

3. Issue permanent injunctive relief compelling the Secretary to withdraw his policy of categorically excluding outer continental shelf drilling operations from environmental review;

4. Issue an order setting aside all categorical exclusions of outer continental shelf drilling operations issued by the Secretary subsequent to the *Deepwater Horizon* oil spill;

5. Award Plaintiff its costs of litigation, including reasonable attorneys fees under the Equal Access to Justice Act; and

6. Grant Plaintiff such other relief as the Court deems just and proper.


DATED: May 18, 2010.

Respectfully submitted,

William J. Snape, III (DC Bar # 455266)
CENTER FOR BIOLOGICAL DIVERSITY
5268 Watson Street, NW
Washington, DC 20016
Ph: 202-537-3458
Fax: 415-436-9683
billsnape@earthlink.net

Attorney for Plaintiff